IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION


GWYN L. HOWARD                                                                        Plaintiff

VS.                                                        CIVIL ACTION NO. 1:05CV334KS-MTP

HANCOCK MEDICAL CENTER                                                    DEFENDANT


**MEMORANDUM OPINION AND ORDER**

This cause is before the court on defendant's motion for summary judgment. From its review of all matters made a part of the record of this case as well as applicable law, and being thus fully advised in the premises, the court FINDS that the motion is well taken and should be granted. The court specifically finds as follows:

FACTUAL BACKGROUND

Plaintiff Gwyn L. Howard was a phlebotomist at defendant Hancock Medical Center ("Hancock"), a critical care facility located in Bay St. Louis, Mississippi, from September 16, 1999 until on or about September 16, 2004. As a phlebotomist, it was plaintiff's responsibility to draw blood ordered by physicians so that tests could be ordered to make diagnoses and determine treatment plans. At the time of her discharge, plaintiff's supervisor was Mickey Bryant, the Laboratory Manager, and Mr. Bryant reported directly to Hal Leftwich, the Hospital Administrator. Ms. Howard was an at-will employee at Hancock.

Guidelines set forth by the Federal Emergency Management Agency require Hancock to remain open and be prepared for disasters such as hurricanes. Accordingly, Hancock has

1

prepared procedures to follow to ensure the safety of its patients and employees when the area is threatened with a hurricane (the "Hurricane Plan").  Under the Hurricane Plan, certain employees are "locked in" during the hurricane.  These employees are expected to report to work when the hospital calls a "Condition I" (hurricane force winds expected within 8 hours), at which time all other personnel are released.  Employees indicate their desire to work the lock-down crew by signing their name on the sign-up sheets.  Certain other employees are assigned as "recovery," meaning that they are expected to return to the hospital when the storm has passed to relieve the crew who rode out the hurricane.

Hancock's employee handbook (the "Employee Handbook") states that an employee must notify her Supervisor or Department Director of an absence in advance as soon as she knows she needs to be absent.  The Employee Handbook also states that an employee who is going to be absent for any reason is expected to notify the Supervisor or Department director before the beginning of the employee's regularly scheduled shift, and should advise the Supervisor daily for absences of more than one day.  Mr. Leftwich testified that prior approval for absences is required, either weeks or days in advance with respect to use of vacation time or Paid Time Off ("PTO"), and four hours advance notice with respect to illness or emergency.   With respect to vacation or PTO, according to Mr. Bryant the general policy at Hancock was that employees must give two weeks of notice and that such requests are granted or denied in the supervisors' discretion.  The Employee Handbook provides that except for illness or emergency, PTO must be requested in advance in writing and approved by the employee's supervisor.  According to plaintiff, however, Hancock did not maintain stringent guidelines for the reasons an employee could take time off from work and supervisory approval was merely "perfunctory."  Plaintiff

testified that only one hour of advance notice for absences was required. The Hurricane Policy does not specifically address whether an employee may take PTO prior to a hurricane, but Mr. Leftwich testified that employees cannot use PTO during times of hurricanes. Mr. Leftwich also testified that because of attendance problems in the past during hurricanes, Hancock had made it very clear in department meetings hospital-wide prior to plaintiff's termination that if people did not show up to work during hurricanes, they would be subject to termination. The Hurricane Policy states that employees' families are not allowed to take shelter at the hospital during a hurricane.

The Employee Handbook states that "[r]efusal to work, without good reason, when needed in times of emergency call-ins, disaster, patient emergency, etc." is considered a "Group II violation." The penalties for Group II violations are as follows: first offense - written warning and/or suspension; and second offense - discharge. The Employee Handbook further provides that if an employee is absent from work for more than one day without notice, the employee may be subject to immediate discharge. "Failure to accept work schedule as to time or duty assigned" is listed as a Group III violation, for which the penalty is suspension and/or discharge for the first offense.

In September 2004, a tropical disturbance began brewing in the Atlantic Ocean, which ultimately became Hurricane Ivan. The National Weather Service predicted that wherever Hurricane Ivan hit land, it would potentially strike as a category 4 or 5 hurricane. On Sunday, September 12, 2004, plaintiff first learned about Hurricane Ivan and its threat to the Mississippi Gulf Coast. When she came home from work after her shift ended around 12:30pm on Monday, plaintiff and her husband discussed possible evacuation with her husband's mother (who suffers

from a heart condition). Around 9:00 pm on Monday evening, plaintiff and her husband decided that they would evacuate early on Tuesday morning. Plaintiff was scheduled to work on Wednesday, September 14 and on Thursday, September 15 from 4:00 am until 12:30pm.

At 3:00 am on Tuesday, September 14, plaintiff called Hancock and spoke with Jackie Weeks, a Lab Technician in the Laboratory Department. Plaintiff told Ms. Weeks that she was evacuating and would not be in to work. Ms. Weeks told plaintiff that she would let Mr. Bryant (the Laboratory Manager) know of plaintiff's absence. This was the first time plaintiff missed work around the time of a hurricane. Plaintiff also called Mr. Bryant's office and left him a voicemail that she would be leaving town for the hurricane and would be back for the relief shift. Plaintiff then called the House Supervisor to let her know that she was evacuating and would be using paid time off. Plaintiff told the House Supervisor that she had already notified the Laboratory and Mr. Bryant. The House Supervisor asked plaintiff if she was scheduled to work and plaintiff said that she was on the schedule. The house supervisor asked if plaintiff was scheduled to work on the lock-down crew, and plaintiff said no, that she was going to work on the relief crew. The house supervisor said that she was also working on the relief crew.

Plaintiff, her husband, and his mother then evacuated. Later that same day, a mandatory evacuation was called for the area. Also later that same day, plaintiff received a phone call from Pam Delgiorna, another supervisor in the Laboratory Department. Ms. Delgiorna asked plaintiff what she was doing and if she knew that her job could be in jeopardy. Plaintiff told Ms. Delgiorna that she was evacuating with her husband and mother-in-law and that they were already out of town. Plaintiff told Ms. Delgiorna that she and her family were already almost in Jackson, Mississippi and that they could not turn around and come back. Plaintiff also told Ms.

Delgiorna that she had previously spoken with Ms. Weeks, left a voicemail message for Mr. Bryant and had spoken with the House Supervisor notifying everyone of her absence. Ms. Delgiorna said "okay." Later on Tuesday, plaintiff received a phone call from Mr. Bryant. Mr. Bryant told plaintiff that her job could potentially be in jeopardy. Plaintiff told Mr. Bryant that she was already out of town and there was no turning back.

On Wednesday morning, plaintiff called Hancock and left another message for Mr. Bryant. Plaintiff then spoke with the House Supervisor on duty. She told the House Supervisor that she would be calling Thursday morning to find out when the lock-down was going to be lifted. The House Supervisor gave plaintiff a number to call. On Thursday, plaintiff called the number and listened to the recording that said employees working relief were to report back to work on Friday and lock-down would be lifted at 7:00. Plaintiff arrived back home later that day. During her return trip, plaintiff received another phone call from Ms. Delgiorna, who told plaintiff that she had been terminated.

According to Hancock, Mr. Leftwich made the decision to terminate plaintiff for violating the hospital's Hurricane Policy. Specifically, plaintiff was terminated for abandoning her job, insubordination and failure to report to work. Seven other employees - all female - were terminated for violating the hurricane policy. Mr. Leftwich admitted in his deposition that most of these seven people evacuated because of a family member or some other personal situation. All employees who missed a scheduled worktime prior to, during or immediately following the hurricane were terminated. After the hurricane, plaintiff was not replaced because the volume of patients was too low. Rather, another phlebotomist was moved from another shift to work plaintiff's shift.

On or about March 10, 2005, plaintiff filed a Charge of Discrimination with the EEOC alleging sex discrimination. Plaintiff then commenced this action on July 8, 2005, asserting claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* and state law.[1] Defendant moved for summary judgment on August 7, 2006.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is to be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Williams v. Adams*, 836 F.2d 958, 960 (5th Cir. 1988). The moving party, however, need not negate the elements of the non-movant's case. *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) *(citing Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once the moving party satisfies its initial burden, the non-movant may not rest on the pleadings, but must "identify specific evidence in the . . . record demonstrating that there is a material fact issue concerning the essential elements of its case.'" *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (citation omitted); *see also Celotex*, 477 U.S. at 322-

---

[1] In her Complaint, plaintiff also asserted claims under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* Plaintiff voluntarily dismissed these claims by notice filed on June 26, 2006.

23; *Anderson*, 477 U.S. at 257. "The moving party need not support its motion with affidavits or other evidence, but to defeat a motion for summary judgment the nonmovant must present evidence sufficient to establish the existence of each element of his claim as to which he will have the burden of proof at trial." *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560, 565 (5th Cir. 1995) (citation omitted).

In analyzing a motion for summary judgment, all evidence must be "construed in the light most favorable to the nonmoving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams. v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir. 1996) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor." *Palmer v. BRG, Inc.*, 498 U.S. 46, 49 n.5 (1990) (*quoting Anderson*, 477 U.S. at 255). Nevertheless, "conclusory allegations, speculation and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Douglass*, 79 F.3d at 1429 (citation omitted). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "In such situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23.

## ANALYSIS

### Federal Claims - Sex Discrimination

Plaintiff has asserted two Title VII claims for sex discrimination: one on the basis of disparate treatment, and the other on the basis of disparate impact. Each will be addressed

separately.

## Disparate Treatment

Under the test established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in order to make out a prima facie case of sex discrimination under a disparate treatment theory, in the absence of direct evidence plaintiff must show that: 1) she was a member of a protected class; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) others similarly situated were more favorably treated or that she was replaced by someone not in the protected class. *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001) (citations omitted); *Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998) (citations omitted). The parties' dispute over this claim centers on whether plaintiff has established the fourth prong of the test.

In her response to the motion for summary judgment, plaintiff identifies a Mr. Gary Helminski, a Certified Nursing Assistant at Hancock, as being similarly situated to her. Mr. Helminski was scheduled to work the recovery shift at Hancock during Hurricane Ivan. Prior to his shift, Mr. Helminski called Brenda Hoffman, the Supervisor of ICU/Surgical/Pediatric, to inform her that he would be approximately one and one-half hours late to work. Ms. Hoffman told Mr. Helminski that although technically she could terminate his employment, instead she would be placing him on "call status." Mr. Helminski did not ultimately get called into work[2] nor was he terminated. Ms. Hoffman explained in her affidavit that after the hurricane, the

---

[2] According to Mr. Helminski, another male (African-American) employee, Mr. Johnny Davison, was called into work instead. Ms. Hoffman denies ever calling in such an individual - indeed, Ms. Hoffman denies ever supervising or even knowing such an individual. At any rate, this is not relevant for the purposes of this opinion.

patient census was much lower than had been expected before the hurricane struck - it was so low, in fact, that they combined the second floor patients with the first floor patients, and that this resulted in too many employees being scheduled to work after the hurricane for the recovery phase.  Ms. Hoffman stated that at the time Mr. Helminski called her to say he would be late, she was already calling both male and female employees to tell them they were not needed.  Ms. Hoffman advised Mr. Helminski that they were reducing staff and she would call him if she needed him. Ms. Hoffman explained that additional certified nursing assistants were not needed.

Employees with different responsibilities, different supervisors, and who engaged in different violations of company policy are not similarly situated.  *Okoye*, 245 F.3d at 514-15 (citing cases); *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991); *Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1180 (5th Cir. 1990). And in order to make a case for discriminatory discharge, the misconduct for which Ms. Howard was discharged must be "nearly identical" to that of a male employee who was not discharged.  *Smith*, 891 F.2d at 1180 (citation omitted).

Plaintiff simply cannot make this showing.  Mr. Helminski held a different position than Ms. Howard and had a different supervisor than her.  Moreover, Ms. Howard's and Ms. Helminski's violations of company policy were not "nearly identical."  Mr. Helminski called in during the post-hurricane recovery period to say he would be a couple of hours late, at a time when his department was experiencing over-staffing and his supervisor was already calling both male and female employees to let them know they did not need to report to work; Ms. Howard, on the other hand, called in prior to the hurricane (having already decided to evacuate the area) to say that she would not be coming to work at all - potentially putting patients at risk before it was known at that time how severe the hurricane would be or what the patient census would be, and

creating enormous inconvenience for other employees who needed to go home to prepare for working during the lockdown. Ms. Howard was repeatedly warned that she was putting her job at risk, but chose not to report to work anyway. The court finds that Ms. Howard has failed to establish a prima facie case of sex discrimination under a disparate treatment theory and therefore summary judgment is granted for defendant on this claim.[3]

### Disparate Impact

A disparate impact discrimination claim arises when an employer's otherwise neutral policy has a "significantly disproportionate impact" on a protected class. 42 U.S.C. § 2000e-2(k)(1)(A)(1); *Wayne v. Dallas Morning News*, 78 F.Supp. 2d 571, 584 (N.D. Tex. 1999). In order to establish a prima facie case of disparate impact discrimination, plaintiff must: 1) identify the challenged employment practice or policy, and pinpoint the defendant's use of it; 2) demonstrate a disparate impact on a protected group; and (3) demonstrate a causal relationship between the identified practice and the disparate impact. *Gonzales v. New Braunfels*, 176 F.3d 834, 839 (5th Cir. 1999) (citations omitted). Plaintiff argues that the Hurricane Policy, requiring all employees to report for work prior to, during and after a hurricane, has a disparate impact on female employees who are more likely to be the caregivers for children and extended family. Hancock has admitted that only seven individuals - all female - were terminated pursuant to the

---

[3] Plaintiff argues that she has created a genuine issue of material fact regarding the "pretextual nature" of her termination (based on defendant's alleged deviation from its Employment Handbook). However, the court does not need to reach that argument, as plaintiff has failed to make a prima facie case of discrimination. Only if the plaintiff establishes her prima facie case does the burden shift to the defendant to articulate a legitimate, non-discriminatory reason for the termination, at which point plaintiff then has the opportunity to prove that this was a mere pretext for the termination. *Smith*, 891 F.2d at 1178 (citations omitted). As discussed above, plaintiff has not made a prima facie case and therefore no additional analysis is appropriate.

Hurricane Policy, and that most of these employees had "some version of a family member or ... some other personal issue" that caused them to evacuate at the time of Hurricane Ivan and, therefore, to be terminated for not working immediately before, during or after the time of the hurricane.  Thus, 100% of employees terminated pursuant to the Hurricane Policy were female.  The court finds that plaintiff has made a prima facie case of disparate impact discrimination.

Having established a prima facie case, the burden shifts to defendant to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity."  42 U.S.C. §§ 2000e-2(k)(1)(A)(I), (B)(ii); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (citation omitted); *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 997-98 (1988).  The purpose of Hancock's Hurricane Policy is to ensure that there is sufficient staffing so that medical services can be adequately provided to patients at a time of emergency such as a hurricane.   This policy is both job related and consistent with business necessity.  Having met its burden, plaintiff must show that an alternative to the challenged practice with less disparate impact exists that would serve Hancock's legitimate interests.  *Watson*, 487 U.S. at 998; *IBEW v. Miss. Power & Light Co.*, 442 F.3d 313, 317-18 (5th Cir. 2006).  The alternative must be equally as effective as the challenged practice, taking into account the relative costs of the challenged and alternative practices, as well as any other burdens.  *Bernard v. Gulf Oil Corp.*, 890 F.2d 735, 744 (5th Cir. 1989) (*citing Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 661 (1989)).

Plaintiff argues that Hancock could have allowed employees to bring their family members to work during a hurricane.  However, plaintiff has offered no evidence that this alternative policy would serve Hancock's legitimate interests of ensuring sufficient staffing in order to provide medical care to patients or that it would be equally as effective as the Hurricane

11

Policy. The fact that some doctors may have brought their families to Hancock during the hurricane (without requesting permission from the hospital), does not prove - as plaintiff alleges - that this is a viable hospital-wide policy alternative to the Hurricane Policy.[4] Moreover, such an alternative policy would presumably place a heavy burden on Hancock, and there is simply no authority for the proposition that a hospital must become a shelter during a hurricane. Accordingly, the court finds that summary judgment for defendant on this claim is warranted.

## State Law Claims

### Intentional Infliction of Emotional Distress

Plaintiff alleges that Hancock's "willful, wanton and reckless disregard for plaintiff's rights and interests, inflicted emotional distress on the Plaintiff by the aforesaid acts and omissions." In order to state a cause of action under Mississippi law for the tort of intentional infliction of emotional distress, the defendant's conduct must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Raiola v. Chevron USA, Inc.*, 872 So. 2d 79, 85 (Miss. Ct. App. 2004), *reh'g denied*, 2004 Miss. App. LEXIS 513 (Miss. Ct. App. 2004) (citation omitted); *see also Eaves v. K-Mart Corp.*, 193 F.Supp. 2d 887, 894 (S.D. Miss. 2001) ("To be actionable, a defendant's conduct should evoke outrage or revulsion."). Thus, a cause of action does not lie for "mere insults, indignities, threats, annoyances, petty oppression or other trivialities." *Raiola*, 872 So. 2d at 85.

In light of this high standard, therefore, "[a] claim for intentional infliction of emotional

---

[4] Mr. Leftwich testified that one or two doctors showed up with some family members and were asked to leave. A few of them showed up too late for them to evacuate so they stayed.

distress will not ordinarily lie for mere employment disputes." *Lee v. Golden Triangle Planning & Dev. Dist., Inc.*, 797 So. 2d 845, 851 (Miss. 2001) (citations omitted); *see also Raiola*, 913 F.Supp. at 982 (same). In general, causes of action for intentional infliction of emotional distress within the context of a workplace environment are "limited to cases involving a pattern of deliberate, repeated harassment over a period of time." *Lee*, 797 So. 2d at 851 (citations omitted); *Pegues v. Emerson Elec. Co.*, 913 F.Supp. 976, 982-83 (N.D. Miss. 1996) (same) (citations omitted). Indeed, the Fifth Circuit has noted that "[o]nly in the most unusual cases does the conduct move out of the 'realm of an ordinary employment dispute' into the classification of 'extreme and outrageous,' as required for the tort of intentional infliction of emotional distress." *Prunty v. Arkansas Freightways, Inc.*, 16 F.3d 649, 654-55 (5th Cir. 1994), *reh'g denied en banc*, 1994 U.S. App. LEXIS 10164 (5th Cir. 1994). *Accord Brown v. Inter-City Fed'l Bank for Savings*, 738 So. 2d 262, 265 (Miss. Ct. App. 1999) ("More is required to support an intentional infliction of emotional distress recovery than the usual age discrimination claim.").

    Plaintiff argues that defendant's "act of forcing [her] to choose between the health and safety of her family and her job...particularly during the time of a natural disaster" constituted intentional infliction of emotional distress. However, as defendant points out, "[i]f such were the case, no employer of first responders in emergency situations could require their employees to do anything during a crisis." Plaintiff was aware that Hancock is located on the Mississippi Gulf Coast, and that it remains open 365 days a year, 24 hours a day. She also understood that employees may be required to work before, during and after a hurricane. She was an at-will employee and knew that she could be terminated at any time, for any reason. Plaintiff chose to evacuate (prior to lockdown and prior to a mandatory evacuation) rather than report to work

during an emergency situation - despite being repeatedly warned that her job was in jeopardy. The court finds that the evidence in the record falls well short of what is required for plaintiff to have a viable claim for intentional infliction of emotional distress and therefore summary judgment for defendant on this claim is granted.

### Negligent Infliction of Emotional Distress

The court need not reach the substance of this claim, as it agrees with defendant that it is barred by the exclusive remedy provision of the Mississippi Workers' Compensation statute. Mississippi Code Annotated § 71-3-9.[5] In *Campbell v. Jackson Business Forms Co.*, 841 F.Supp. 772 (S.D. Miss. 1994), plaintiff sued her employer alleging that she had been sexually harassed and asserting claims under Title VII, as well as various state law claims, including negligent supervision. The court dismissed this claim, holding that it was "clearly barred" by the Workers' Compensation statute. *Id.* at 774. "Because [plaintiff] alleges that her claim arose out of the employer-employee relationship between her and [defendant], and because the tort claim is clearly grounded in negligence, her negligent supervision claim...is barred by the Workers' Compensation Law. *Id.* (citations omitted). *See also Means v. B & G Food Enters.*, 2006 U.S. Dist. LEXIS 65835, at * 39-40 (S.D. Miss. Sept. 13, 2006) (holding that plaintiff's claims of negligence and negligent infliction of emotional distress stemming from allegedly hostile work

---

[5] This section provides: "The liability of an employer to pay compensation shall be exclusive and in place of all other liability of such employer to the employee...at common law or otherwise from such employer on account of such injury...." The Mississippi Supreme Court has carved out a narrow exception to this provision, holding that an employee can sue her employer in tort where the injury was caused by the willful act of an employee acting in the course of employment and in furtherance of the employer's business. *Miller v. McRae's, Inc.*, 444 So. 2d 368, 371-72 (Miss. 1984). Allegations of negligence do not meet this exception. *Mullins v. Biglane Operating Co.*, 778 F.2d 277, 279 (5th Cir. 1985).

environment were barred by worker's compensation statute); *Disney v. Horton*, 2000 U.S. Dist. LEXIS 5359, at *27-28 (N.D. Miss. 2000) (granting summary judgment for defendant on negligent infliction of emotional distress claim based on alleged workplace sexual harassment because "Mississippi cases which have considered the viability of a negligence claim in the employer/employee context refused to allow such an action."); *Griffin v. Futorian Corp.*, 533 So. 2d 461, 463-64 (Miss. 1988) (holding that workers' compensation barred employee's claim that employer willfully failed to remedy a situation that caused injury).  Thus, summary judgment is granted for defendant on this claim.[6]

IT IS, THEREFORE, ORDERED AND ADJUDGED that defendant's motion for summary judgment is granted and plaintiff's complaint is dismissed with prejudice.

SO ORDERED and ADJUDGED on this, the 1st day of December, 2006.


s/ *Keith Starrett*
UNITED STATES DISTRICT JUDGE

---

[6] Because of the court's disposition of plaintiff's two state law claims, it does need - and therefore declines - to address defendant's arguments that the claims are barred by the notice provision of Miss. Code Ann. § 11-46-11 and by the doctrine of collateral estoppel.